**CITY OF ARLINGTON, TEXAS, a Municipal Corporation,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, As Manager of the FSLIC Resolution Fund, Statutory Successor to the Federal Savings and Loan Insurance Corporation, as Receiver for First Texas Savings Association, et al.**

Civ. A. No. CA4–89–073–A.

United States District Court, N.D. Texas, Fort Worth Division.

Nov. 19, 1990.

C. Michael Moore, Locke, Purnell, Rain, Harrell, Dallas, Tex., for First Gibraltar Bank.

Walter G. Pettey III, Pettit & Martin, Dallas, Tex., Jordan Luke, Dorothy L. Nichols, Michael H. Solomon, Office of the General Counsel, Washington, D.C., Joe C. Holzer, Houston, Tex., and Larry D. Carlson, Robert W. Teeter, Baker & Botts, Dallas, Tex., Kirk K. Van Tine, Timothy S. Durst (Charles L. Cope II, and Christopher Bellotto, F.D.I.C., of counsel), Washington, D.C., for F.D.I.C.

Lee F. Christie, Pope, Hardwick, Christie, Harrell & Kelly, Alan Wilson, Simon, Anisman, Doby, Wilson & Skillern, Fort Worth, Tex., for plaintiffs.

## MEMORANDUM OPINION

McBRYDE, District Judge.

Came on for consideration the motions of defendants Federal Deposit Insurance Corporation, as Manager of the FSLIC Resolution Fund, statutory successor to the Federal Savings and Loan Insurance Corporation, in its corporate capacity, ("FDIC/Manager–Fund") and First Gibraltar Bank, FSB, ("First Gibraltar") for summary judg-

ment and the cross-motion of plaintiff, City of Arlington, Texas, ("plaintiff") for summary judgment. These three are the only remaining parties to this action. For the reasons stated herein, the Court finds that First Gibraltar's motion should be denied, plaintiff's cross-motion should be granted in major part, and FDIC/Manager–Fund's motion should be granted in part.

### History of Litigation

This action was commenced in state court as a suit by plaintiff against First Texas Savings Association ("First Texas") for relief based on allegations of impropriety on the part of First Texas in reference to an escrow account that existed at First Texas for the benefit of plaintiff. On December 27, 1988, First Texas was declared insolvent and Federal Savings and Loan Association ("FSLIC"), in its capacity as receiver for First Texas, removed the action to this Court.

By amended complaint, plaintiff named as additional defendants FSLIC, in its corporate capacity, and First Gibraltar, which had entered into an acquisition agreement in reference to First Texas with FSLIC, as receiver for First Texas. FSLIC, as receiver for First Texas, replaced First Texas as a defendant. By order signed in February 1990 Federal Deposit Insurance Corporation ("FDIC"), as manager of the FSLIC Resolution Fund, in its separate capacities as (1) statutory successor to FSLIC as receiver for First Texas and (2) statutory successor to FSLIC in its corporate capacity, was substituted for FSLIC, in its capacity as receiver for First Texas and in its corporate capacity, as a defendant. FDIC, as manager of the FSLIC Resolution Fund, as statutory successor to FSLIC as receiver for First Texas, was dismissed voluntarily by plaintiff. Each of the remaining parties has filed a motion for summary judgment, which will be discussed in more detail at a later point in this opinion.

### Undisputed Facts

The summary judgment record, which includes open court admissions, establishes as undisputed facts that:

First Texas was a state chartered savings and loan association whose deposits were insured by FSLIC. On May 16, 1985, First Texas entered into a loan agreement with Shady Valley West Joint Venture ("Joint Venture"), pursuant to which First Texas agreed to loan up to $29,620,000.00 to Joint Venture for acquisition and development of certain real property located in Arlington, Tarrant County, Texas. *See* Ex. A to the affidavit of Denise Locascio ("Locascio Aff.")[1] In connection with the loan agreement, Joint Venture was required to post an irrevocable standby letter of credit in the amount of $4,100,000.00 "for the purpose of assuring First Texas that funds are and will be available for the construction of the said proposed Green Oaks Boulevard through the Property." Locascio Aff. Ex. D. The agreement relating to the letter of credit further provided:

> In any event, all proceeds derived by First Texas pursuant to the letter of credit shall be used solely for the construction through the property of the proposed Green Oaks Boulevard between Texas Spur 303 and West Division Street.

Locascio Aff. Ex. D. The letter of credit was amended several times to extend the maturity date.

On June 3, 1986, Joint Venture and First Texas entered into a letter agreement modifying the terms of the loan agreement to provide, among other things, that First Texas would hold the sum of $2,300,000.00 "for the construction costs relating to Green Oaks Boulevard ..." Locascio Aff. Ex. H. First Texas submitted a draw request pursuant to the terms of the letter of credit and on June 6, 1986, a total of $2,697,993.70 was wired to First Texas.

---

1. For convenience, the Court will, from time to time, refer to particular exhibits attached to the affidavit of Denise Locascio from which specific provisions may be quoted or otherwise referenced. The parties do not dispute that the exhibits are copies of operative documents regarding the loan and the account the subject of this action. The citation to a particular document does not mean that the Court bases any particular finding or conclusion solely on such document.

Locascio Aff. Ex. K. Said sum was deposited in First Texas Money Maker Plus Account No. 30–891–665–3 ("the Account"). The Account was styled "FTSA Tr for Shady Valley J.V.," which stood for "First Texas Savings Association as Trustee for Shady Valley Joint Venture." Pursuant to the terms of the June 3 agreement, the Account was reduced by the sum of $297,-993.70.

Subsequently, Joint Venture requested that the Account be used to pay monthly interest due on the loan. The request was denied "with the understanding that after the completion of Green Oaks Boulevard all moneys remaining in said account will be returned," once again referencing the specific purpose for which funds had been deposited into the Account. Locascio Aff. Ex. O.

On or about September 26, 1986, First Texas and Joint Venture entered into a modification agreement, which purported to authorize withdrawal of all sums in excess of $2,100,000.00 out of the Account (which was erroneously referred to as "Certificate of Deposit No. 308916653") and to provide that the funds remaining in the Account would secure payment of the loan. The modification stated:

> Provided there is no event of default under any of the loan documents, the remaining amount in Certificate of Deposit No. 308916653 shall be utilized to construct Green Oaks Boulevard and the bridge in accordance with the prior agreement between borrower and lender.

Locascio Aff. Ex. P.

At or about the same time, Joint Venture, First Texas, and plaintiff entered into an escrow agreement ("escrow agreement") setting forth the obligations of the parties with respect to the construction of a part of Green Oaks Boulevard. It was dated September 24, 1986, signed on behalf of Joint Venture shortly thereafter, and accepted by signatures on behalf of First Texas and plaintiff, respectively, on September 29, 1986, after the execution of the above-referenced modification agreement. Locascio Aff.Ex. Q. The controversy centers around the escrow agreement.

First Texas kept and maintained a copy of the escrow agreement in its records. Locascio Aff. page 7. It said that plaintiff was requiring the sum of $2,100,000.00 to be "escrowed to complete the construction of a portion of Green Oaks Boulevard from Spur 303 to Orion Parkway …" (which was referred to in the letter agreement by the word of art "work"). Locascio Aff. Ex. Q. The escrow agreement defined the rights of parties to the escrowed funds as follows:

> Accordingly consideration of mutual covenants and obligations herein set forth, the City, The Venture and First Texas hereby agree and obligate themselves as follows:
>
> 1. Upon the execution hereof by all the parties, First Texas agrees to place the sum of Two Million One Hundred Thousand and No/100 Dollars ($2,100,-000.00) in a separate interest bearing account designated "Escrow Account–Arlington" *to be utilized for the completion of the Work;* provided, however, it is expressly agreed and understood that First Texas, unless prohibited by the City in writing (which writing shall not be given without just cause) shall fund invoices for progress payments submitted to First Texas in respect of the Work.
>
> . . . .
>
> 3. If and only if the Venture fails or refuses to commence construction of the Work within one month of the execution hereof, or Venture fails or refuses to complete and gain the City's acceptance of the Work on or before one hundred eighty working days, *the City may,* but shall never be required to, *complete the Work by hiring a private contractor and having such contractor submit invoices to First Texas; such invoices shall be paid to the private contractor by First Texas out of the escrow account.* (emphasis added)

Locascio Aff. Ex. Q, pages 1–2.

The intent of the parties was that the Account would be the "Escrow Account–Arlington" that was contemplated by the

escrow agreement; and, once the agreement was made, the parties considered that the Account was the "Escrow Account–Arlington." First Gibraltar's second supplemental interrogatory answers, Ans. 17. In other words, the placement by First Texas of $2,100,000.00 in a separate account was accomplished by allowing the Account to remain in existence at First Texas, and all parties viewed the Account to be the "Escrow Account–Arlington," and as satisfying the requirements of the escrow agreement that First Texas place the sum of $2,100,000.00 in a separate account bearing the account designation "Escrow Account–Arlington." The failure to change the account name to "Escrow Account–Arlington was the result of neglect on the part of First Texas. First Texas records always showed the true nature of the Account and plaintiff's beneficial interest in the Account. At or about the time plaintiff executed the escrow agreement, an officer of First Texas told the attorney for plaintiff that the account contemplated by the escrow agreement was established. Doegey Aff., p. 2.[2]

Joint Venture defaulted on its loan agreement with First Texas; and, on April 16, 1987, First Texas showed on its records that it was offsetting the Account (which, at that time, contained the sum of $2,537,-956.60) against the indebtedness owed by Joint Venture. Plaintiff subsequently discovered the April 16, 1987, offset entry, and, by letter dated May 7, 1987, plaintiff made demand on First Texas to reinstate the Account. When First Texas failed to comply with the demand, plaintiff filed the state court action against First Texas on or about May 27, 1987.

On December 27, 1988, the Federal Home Loan Bank Board declared First Texas insolvent and appointed the FSLIC as receiver. Thereafter, by agreement ("acquisition agreement") with FSLIC as Receiver for First Texas ("FSLIC/Receiver"),

First Gibraltar assumed certain of First Texas' assets and its liabilities to secured creditors, taxing authorities *and depositors*. The real property acquired with the funding provided pursuant to the loan agreement and across which a portion of Green Oaks Boulevard was to be constructed was transferred from First Texas, which had acquired the property through foreclosure, to the predecessor of defendant FDIC/Manager–Fund.

By the terms of the First Gibraltar–FSLIC/Receiver acquisition agreement, First Gibraltar expressly assumed and agreed to pay, perform and discharge all of First Texas' liabilities to depositors with respect to their deposits. Hurst Aff. Ex. B. As First Gibraltar admitted in response to a request for admission, the effect of the acquisition agreement was to cause First Gibraltar "to assume the liabilities of First Texas to its Depositors with respect to their deposits." First Gibraltar's Response to First Request for Adm., Resp. 6. The word "deposit" was defined as "a withdrawable or repurchasable share, investment certificate, or deposit in [First Texas] of a type that is (or would be but for the $100,000 limitation) insurable under Section 405(a) of the National Housing Act [12 U.S.C. § 1728(a) (1982)] ..."[3] The term "depositor" was defined as the holder of a deposit in First Texas. The Account was a type of account approved for deposit insurance by the FSLIC, i.e. an account insurable under 12 U.S.C. § 1728(a).

Joint Venture did not commence construction of the boulevard mentioned in the escrow agreement, nor has plaintiff commenced the work. Plaintiff could commence the construction work within six months, and complete it within two years, after the funds in issue are made available.

### The Summary Judgment Motions

The motion for summary judgment of First Gibraltar urges two grounds, first,

---

2. The facts stated in this paragraph found confirmation in admissions made by the parties at November, 1990, hearings.

3. Although Section 1728 and other deposit insurance provisions of the National Housing Act were repealed by the Financial Institutions Re-

form, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183, the parties do not dispute that the laws in effect at the time of the First Texas takedown apply to the resolution of this action.

that plaintiff's claims are simply general unsecured claims against the receivership estate of First Texas, that did not "pass through" the First Texas receivership to First Gibraltar, and, second, that the assets at issue (having reference to the land that secured the loan of First Texas to Joint Venture) in this action, and which relate to the escrow dispute, are now owned by FDIC in its corporate capacity and have never been owned by First Gibraltar. First Gibraltar acknowledges in its motion that it entered into the acquisition agreement but denies that it incurred any liability to plaintiff by reason of having done so.

When plaintiff responded to First Gibraltar's motion, it countered with a motion for summary judgment of its own. The central points of plaintiff's motion are that First Texas entered into the escrow agreement, that an officer of First Texas confirmed to plaintiff that the account contemplated by the escrow agreement had been established, that pursuant to the escrow agreement First Texas was to hold on deposit the sum of $2,100,000.00 in a separate interest-bearing account to be designated "Escrow Account–Arlington," that the funds so maintained were for the benefit of the plaintiff and were to be utilized to finance the construction of a portion of Green Oaks Boulevard, that First Texas offset the deposit, and that, notwithstanding plaintiff's request that it do so, First Texas refused to restore the deposit. Plaintiff urges in its motion that, from these facts, the conclusion should be reached that, by reason of the obligations undertaken by First Gibraltar under the acquisition agreement, First Gibraltar assumed depositor liability to plaintiff with respect to the deposit in question.

FDIC/Manager–Fund's motion for summary judgment asserts reliance on an order the Court signed on March 20, 1990, by which the Court granted certain relief to

FSLIC in its capacity as receiver in response to its motion, made in such capacity, to dismiss.[4] The motion of FDIC/Manager–Fund goes on to assert that plaintiff's claims are potential liabilities of FDIC-receiver and cannot be asserted against FDIC/Manager–Fund.

Plaintiff responded to FDIC/Manager–Fund's motion, as it had First Gibraltar's motion; and, First Gibraltar and FDIC/Manager–Fund both responded to plaintiff's motion.

*Proceedings Related to Motion for Summary Judgment, and Pretrial Order*

At two hearings, one held November 1, 1990, and the other November 5, 1990, the Court took up with the parties the pending motions for summary judgment and the matter of definition of facts that are genuinely in dispute. At each of those hearings admissions were made that the Court has taken into account in identifying undisputed facts. Also, the Court has considered the pre-trial order filed October 4, 1990, in determining existence of facts that are not genuinely in dispute, though the Court is not allowing the pre-trial order to expand the summary judgment issues beyond those raised by the summary judgment responses, when considered together with authorized summary judgment evidence.

*Conclusions from Undisputed Facts*

A. First Gibraltar's Liability to Plaintiff as a "Depositor":

■ From the evidence contained in the record, there can be no doubt that First Texas agreed and understood, from the inception of the Account, that the Account would be used to pay costs of the construction of Green Oaks Boulevard. Because First Texas had actual knowledge, being a party to the escrow agreement, that the funds in the account were held for a partic-

---

**4.** The thrust of the order upon which FDIC/Manager–Fund relies is that plaintiff's claims against FSLIC-receiver (and FDIC in its successor capacity as receiver) for breach of contract and for conversion (plaintiff's unsecured claims) should be dismissed because FSLIC-receiver (and FDIC as successor receiver)

no longer retains any assets of the failed First Texas, with the consequence that there are no assets against which any judgment obtained by plaintiff against FSLIC-receiver (or FDIC in its successor receivership capacity) could be satisfied.

ular purpose and for the benefit of plaintiff, First Texas did not have the right as against plaintiff to offset the Account against the debt of Joint Venture. *South Central Livestock Dealers, Inc. v. Security State Bank of Hedley*, 551 F.2d 1346, 1349 (5th Cir.1977); *National Indemnity Company v. Spring Branch State Bank*, 162 Tex. 521, 348 S.W.2d 528, 529 (1961). Therefore, the bookkeeping offset of the Account was a nullity as to City of Arlington.

■ The defendants make much of the fact that the wrongful offset transaction occurred approximately twenty months prior to the takedown of First Texas. The timing of the offset transaction is not the issue, however. The real question is whether an institution can, by unilateral wrongful act, transform an insured account liability into a nullity, leaving the depositor with a general unsecured claim. The law is clear that the wrongful acts of a failed institution do not absolve the institution's successor from liability for insured deposits. *FDIC v. Barton*, 106 F.2d 737, 738 (10th Cir.1939); *FDIC v. Deaton*, 105 F.2d 677, 679 (10th Cir.1939); *FDIC v. Records*, 34 F.Supp. 600, 602 (W.D.Mo.1940); *Jones v. FDIC*, 24 F.Supp. 985, 986 (W.D.Okla. 1938). The fact that the FDIC chooses to structure its takeovers in a different manner than occurred forty years ago does not affect the validity of the holdings in the above-cited cases.

■ The Court concludes that plaintiff was a depositor of First Texas at the time First Texas was declared to be insolvent, entitled to the benefit of deposit insurance. As stated in *F.A.I.C. Securities, Inc. v. United States*, 595 F.Supp. 73, 77 (D.D.C. 1984), *aff'd*, 753 F.2d 166 (D.C.Cir.1985), where the records of the institution show for whose benefit the account is maintained, the legal measure of insurance protection cannot be withheld. Further, the FDIC's own regulations reflect that a party other than the one making an insured deposit may be treated as the owner of that deposit. *Anheuser–Busch Employees Credit Union v. FDIC*, 651 F.Supp. 718, 722 (W.D.Mo.1986), *aff'd*, 837 F.2d 479 (8th Cir.1987).

The settlement of insurance regulations at 12 C.F.R. 564.1–.11 (1988) cited by defendants, and referred to by plaintiff as the "multiple coverage regulations," apply upon liquidation and payout of insurance when an institution fails. These regulations apply in situations where multiple beneficial owners allege an interest in a particular account or allege ownership interests in different capacities, most often in an attempt to recover more than $100,-000.00 in insurance proceeds. Such is not the situation in this case.

Even if the settlement of insurance regulations do apply, these regulations support the Court's determination that plaintiff is entitled to judgment in this case. 12 C.F.R. § 564.1(a) provides that in the event of default by an insured institution the insured members thereof and the amount of the insured accounts of each such member shall be determined from the account contracts and books and records of the institution. Further, pursuant to 12 C.F.R. § 564.2(b)(1), the account records are used to determine the existence of trusts or other fiduciary relationships. If the existence of a trust or fiduciary relationship is reflected in the account records, then "the details of the relationship and the interests of other parties in the account must be ascertainable either from the records of the association or the records of the account holder maintained in good faith and in the regular course of business." 12 C.F.R. § 564.2(b)(2) (1988).

Here, the summary judgment proof establishes conclusively that First Texas' records maintained in the ordinary course of business disclosed that the funds in the Account were held in trust for the benefit of plaintiff and were to be used for the construction of Green Oaks Boulevard. But for the neglect of First Texas, the name of the account itself would have flagged the escrow nature of the Account and plaintiff's interest in it. The parties have agreed and stipulated that, because First Texas was not liquidated, the $100,-000.00 limit on deposit insurance is not

applicable. Rather, First Gibraltar has assumed liability to all First Texas depositors for the full amount of First Texas' depositor liability. As noted above, First Texas' depositor liability to plaintiff is not diminished by wrongful conduct or neglect on the part of First Texas. The law deems that the status of the Account on December 27, 1988, when First Texas was declared insolvent, was exactly as it would have been if First Texas had not neglected to properly designate the Account and wrongfully shown on its records that the Account was offset. The depositor liability in reference to such an account is liability First Gibraltar assumed by the acquisition agreement.

**B. First Gibraltar's Defensive Contentions:**

The basic defensive contention of First Gibraltar, as urged in its motion for summary judgment, is that plaintiff's claims are general unsecured claims and did not "pass through" to First Gibraltar via the acquisition agreement. For the reasons given above, this contention is unsound unless one of the avoidance-type contentions urged by First Gibraltar has merit. The Court now turns to a consideration of those contentions:

■ 1. The ground of First Gibraltar's motion for summary judgment that it should be given judgment because "[t]he assets [the land that secured the loan of First Texas to Joint Venture] at issue in this case and which relate to the escrow dispute ... are now owned by the Federal Deposit Insurance Corporation in its corporate capacity" and that "[t]hese assets are not now and never have been owned by First Gibraltar" is unsupported by any authority. It is without merit. The ownership status of the land has no relevance to the issue of depositor liability of First Gibraltar to plaintiff. Plaintiff's depositor liability claim against First Gibraltar is not contingent in any respect on legal or equitable ownership by First Gibraltar of the land.

■ 2. In its response to plaintiff's cross-motion, First Gibraltar urges that plaintiff's failure to inform First Texas of an element of a settlement agreement reached in September 1986 between plaintiff and Joint Venture pursuant to which plaintiff agreed to, and did, pay Joint Venture the sum of $1,500,000.00 adversely affects, by way of estoppel, the rights of plaintiff under the escrow agreement. This contention is without merit. Plaintiff had no obligation to inform First Texas of its agreement to pay Joint Venture $1,500,000.00 as part of an overall settlement between plaintiff and Joint Venture, nor did it have any obligation to inform First Texas that it had made such a payment.

3. First Gibraltar's response to the cross-motion makes a point of the fact that none of plaintiff's money was deposited into the Account and that, therefore, plaintiff does not qualify as a "depositor" whose depositor liabilities" were assured by First Gibraltar pursuant to the Acquisition Agreement. The Court already has explained in earlier parts of this opinion why plaintiff qualifies as a "depositor" to whom First Texas had, and First Gibraltar now has, depositor liability.

4. First Gibraltar places reliance in its response on the order the Court signed March 20, 1990, which has been previously mentioned in this opinion, by which the Court dismissed (1) the damage claims of plaintiff against FSLIC in its capacity as receiver, (and FDIC, in its successor capacity as receiver) based on breach of contract and conversion and (2) plaintiff's request for imposition of a constructive trust as against that party in such capacity. In the Court's opinion, the March 20, 1990, order is not pertinent to the depositor liability claims of plaintiff. However, so that there will be no uncertainty on the subject, the Court hereby sets aside and modifies the March 20, 1990, order to whatever extent it is inconsistent with rulings made by the Court in this opinion or the order to be entered on the pending motions for summary judgment, as contemplated by this opinion. The Court adds that the March 20, 1990, order obviously was never intended to resolve in any respect any of the issues

that are being dealt with in this opinion and the order this opinion contemplates.

■ 5. First Gibraltar argues that First Texas' offset of the Account was lawful because the September 26, 1986, modification agreement between First Texas and Joint Venture gave First Texas the right to make the offset. This contention entirely overlooks the fact that plaintiff was not a party to the modification agreement upon which First Gibraltar relies for justification for the offset, while, on the other hand, plaintiff, First Texas and Joint Venture all were parties to the escrow agreement. Quite obviously the tri-party agreement to which plaintiff and First Texas both were parties will prevail, as between them, over the modification agreement, to which plaintiff was not a party, to the extent that there is any inconsistency between the two. The escrow agreement provides, without qualification, that the funds to be contained in the escrow account are to be available for use by the plaintiff in completing the Boulevard construction work. This unqualified right given to plaintiff by the escrow agreement overrides any security interest or other right First Texas might have acquired in the Account as against Joint Venture by virtue of the modification agreement. *See South Central Stock Dealers, Inc. v. Security State Bank of Hendley, supra,* and *National Indemnity Company v. Spring Branch State Bank, supra.*

■ 6. Though not raised, as required by the Local Rules, by First Gibraltar in its response to plaintiff's cross-motion, First Gibraltar is now urging by argument that plaintiff lost its rights under the escrow agreement, and to the Account, because Joint Venture did not move within the time limits specified in the escrow agreement to commence and complete the Boulevard work and because plaintiff did not move with reasonable dispatch to cause the work to be done once Joint Venture failed to commence it. Obviously, plaintiff cannot be penalized by Joint Venture's delinquency. Plaintiff's rights under the escrow agreement were not dependent in any respect on performance of the Boulevard work by Joint Venture within the time frame specified in the agreement.

The only evidence on "timing" from the standpoint of plaintiff is the summary judgment evidence that approximately six months would be required for the City to complete its bid process preparatory to commencement of the work and that approximately two years would be required for completion of the work, all after availability of funds is assured. Hasler Aff., pages 2–3. In this instance, First Texas' conduct, which occurred only approximately six months after the escrow agreement was made, caused the funds to be unavailable. As a matter of law, plaintiff's failure to commence the work prior to the wrongful "offset" cannot be considered to be an unreasonable delay; and, the knowledge by plaintiff after the "offset" occurred that the funds would not be available constitutes full justification for any delay thereafter occurring.

The Court is discussing this contention for the purpose of showing its lack of merit without expressing approval of First Gibraltar's reliance on a ground in opposition to plaintiff's cross-motion that was not properly assigned in First Gibraltar's response.

■ 7. In a supplemental brief filed by First Gibraltar on November 8, 1990, in support of its motion for summary judgment and in opposition to plaintiff's cross-motion, First Gibraltar makes a number of other defense contentions that were not raised in First Gibraltar's response to plaintiff's cross-motion and were not set forth in the pretrial order. These new contentions include claims of legal unenforceability of the escrow agreement because of lack of meeting of the minds, lack of consideration, lack of essential elements, procurement by misrepresentation and fraud, non-approval of the agreement by the Board of Directors of First Texas or its loan committee, and the fact that the escrow agreement was maintained in the credit files of First Texas and was not, according to the contentions, a part of the officially recorded bank documents such as the note, deed of trust and modification agreement. First Gibraltar

failed to properly present any of these contentions for consideration by the Court in connection with the pending motions for summary judgment. Therefore, they are rejected. However, the Court has studied the contentions and has noted that none of them has merit in any event.

### C. Relief to be Granted Plaintiff Against First Gibraltar:

■ Though an actual damage award to plaintiff against First Gibraltar because of the latter's failure to honor its depositor liability to plaintiff could well be established by proof outside the summary judgment record, the Court has concluded that the form of relief that would be a more appropriate response to plaintiff's escrow agreement rights would be to require First Gibraltar to honor, in literal terms, the depositor liability First Texas had, and First Gibraltar assumed, to plaintiff. The summary judgment record supports grant of such relief at this time. It can be afforded by an order directing First Gibraltar to establish and fund (or recognize) an account on its books that will give plaintiff the very things to which it is entitled under the escrow agreement. An award to plaintiff of anything less than that would be inequitable.

Reasonably read, the escrow agreement contemplates that plaintiff is to enjoy the benefit of earned interest as well as principal existing from time to time in the "Escrow Account–Arlington." Thus, the Court is ordering First Gibraltar to include in the account it is to establish (or recognize) pursuant to the rulings of the Court an appropriate interest accrual on $2,100,000.00 from September 29, 1986, to the present and to cause the account to bear interest at an appropriate rate in the future. Past interest will be at the rate of six percent (6%) per annum, bearing in mind the stipulation of the parties that the Account earned, or would have earned, at 6% simple interest per annum from September 29, 1986, through December 27, 1988. Presumably it earned, or would have continued to earn, interest at at least that rate through the present. Future interest accrual will be at the same rate normally applicable to an account similar to the Account.

### D. The Claims of Plaintiff Against FDIC/Manager–Fund and Other Unresolved Claims:

By Count 6 of plaintiff's complaint, as amended, plaintiff seeks an adjudication that plaintiff has an equitable lien on the real property that is the subject matter of the loan agreement between Joint Venture and First Texas; and, by Count 7 of the complaint plaintiff seeks imposition of a constructive trust on such real property. FDIC/Manager–Fund now has ownership of the real property. The Court has concluded that plaintiff's equitable lien and constructive trust theories are without merit, and that FDIC/Manager–Fund's motion for summary judgment should be granted as to those phases of plaintiff's case. The Court does not consider that the other grounds of recovery urged by plaintiff against FDIC/Manager–Fund should be resolved by summary judgment ruling; but, in view of the relief the Court is granting plaintiff against First Gibraltar, the Court has concluded that a severance and separate trial should be ordered as to all remaining claims of plaintiff against FDIC/Manager–Fund as well as all claims of plaintiff against First Gibraltar that are not resolved by rulings in this opinion and entry of order pursuant to this opinion.

### Order to be Entered

For the reasons stated in this opinion, the Court rules, and a separate order ("the order") will be entered formalizing the rulings, that:

1. The motion for summary judgment of First Gibraltar is denied.

2. The motion for summary judgment of FDIC/Manager–Fund is granted as to the relief sought in Counts 6 and 7 of plaintiff's complaint, as amended; and, the requests by plaintiff for imposition of a constructive trust on, or equitable lien against, the real property that is the subject matter of the loan agreement between Joint Venture and First Texas are denied.

3. Plaintiff's motion for summary judgment is granted to the extent set forth in this opinion. In order to satisfy First Gibraltar's depositor liability to plaintiff, the Court is ordering that:

On or before December 21, 1990, First Gibraltar shall establish and fund at First Gibraltar an account in the amount of TWO MILLION ONE HUNDRED THOUSAND DOLLARS ($2,100,000.00), plus interest at six percent (6%) per annum on $2,100,-000.00 from September 29, 1986, through the date when such account is established and funded. Such account shall be an interest bearing account that has withdrawal and interest earning attributes as similar as possible to the Account. First Gibraltar's account records, and the signature card on such account, shall show that First Gibraltar is trustee of the account for the benefit of plaintiff, subject to the terms of the order. The account records and signature card with respect to such account shall identify the order by reference to the style and cause number of this action and the date of the order. First Gibraltar, through its attorneys, shall promptly furnish to plaintiff, through its attorneys, a copy of the signature card for such account; and, First Gibraltar shall furnish to plaintiff, attention "City Attorney of Arlington," on a periodic basis, not less than once every three months, a statement of such account.

The purpose of the funds in such account, including any interest that accrues in the future on such account, is to pay for the construction of the portion of Green Oaks Boulevard in Arlington, Texas, from Spur 303 to Orion Parkway (the "Work"). Plaintiff may hire a private contractor to perform the Work once First Gibraltar has established and funded such account, or before that time if it chooses. Plaintiff shall approve or disapprove the contractor's invoices or draw requests and submit the approved invoices or draw requests to First Gibraltar for payment out of the funds in such account. First Gibraltar shall pay out of such account those draw requests or invoices directly to the contractor within ten (10) days of receipt, with simultaneous notification to plaintiff of payment. First Gibraltar shall have no obligation to pay any sums in excess of the amount in such account plus accrued interest. Upon completion and acceptance by plaintiff of the Work and final payment to the contractor, any funds remaining in such account shall be retained by and belong to First Gibraltar. If completion and acceptance by plaintiff of the Work and final payment to the contractor does not occur within two years from the date First Gibraltar establishes and funds such account, First Gibraltar may apply to this Court for an order allowing First Gibraltar to withdraw and keep as its own any remaining funds in the Account.

4. Costs of court are taxed against First Gibraltar.

5. A severance is ordered, and a separate trial is to be held, with respect to all claims and causes of action asserted by, and all relief sought by, plaintiff against FDIC/Manager–Fund and First Gibraltar that are not resolved by rulings in this opinion and the order.

6. The Court directs entry of final judgment as to all claims and causes of action that are resolved by the rulings in paragraphs 1, 2, 3 and 4 above. The Court expressly determines that there is no just reason for delay in entry of final judgment as to such claims and causes of action, and the Court is expressly directing entry of final judgment as to all such claims and causes of action.